# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 21, 2014 at Knoxville

## STATE OF TENNESSEE v. KATIUS J. WILLIAMS

**Appeal from the Circuit Court for Dyer County**
**No. 09-CR-398      Russell Lee Moore, Jr., Judge**

**No. W2013-02542-CCA-R3-CD  - Filed December 30, 2014**

The Defendant, Katius J. Williams, was indicted on one count each of aggravated burglary, aggravated rape, and aggravated robbery. See Tenn. Code Ann. §§ 39-13-402, -13-502, -14-403. Following a jury trial, the Defendant was convicted of aggravated burglary, aggravated rape, and the lesser-included offense of theft of property valued at $500 or less. See Tenn. Code Ann. §§ 39-14-103, -105. The trial court sentenced the Defendant as a Range II, multiple offender to an effective forty-year sentence. On appeal, the Defendant contends (1) that the evidence was insufficient to sustain his convictions; (2) that the trial court erred by making "no findings as to why maximum sentences were appropriate"; and (3) that the total effective sentence was excessive. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

James E. Lanier, District Public Defender; and Timothy Boxx, Assistant Public Defender, for the appellant, Katius J. Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; and C. Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

The victim, A.R.,[1] testified that she was a lesbian and that in July 2009, she and her partner rented a house in Dyersburg, Tennessee. A.R. testified that her partner worked nights and that after her partner left for work on the night of July 24, 2009, she fell asleep in their bedroom watching a horror movie. A.R. testified that she woke up to an African-American man "standing in front of [her] with a bandana over his face . . . and a gun in [her] face." The man rolled the victim onto her stomach and tied her hands behind her back. To cover her eyes, the man "wrapped something around [her] head and tied it." Then the man "tried to wrap something around [her] mouth but it wouldn't stay so he took it off and just stuck it in [her] mouth."

A.R. testified that the man "started asking [her] where the money was." A.R. told the man that all she had was twenty-three dollars on the coffee table in the living room. The man walked out of the bedroom, came back, and told her that he could not find the money. A.R. testified that she then "had to tell him exactly where it was." The man left the room and came back a short time later. A.R. testified that when the man came back that time, he "rolled [her] over on [her] back and started taking [her] shorts off." The man "tried to rip [her] panties off but he couldn't get them to rip off so he just took them off." A.R. testified while the man did this, her hands were still bound and her face was still covered.

A.R. testified that once the man removed her panties, he penetrated her vagina with his penis. The man "turned [her] sideways across the bed and [] put a pillow over [her] head" while he raped her. The man told her to "f--k back" and told her to "shut up" when she started to cry. When he finished, the man "went and got a wet wash cloth, [] and washed [her] off." The man put her shorts back on and "then [she] heard a vacuum cleaner running." The man sat her "up on the edge of the bed" and told her that "if [she] could get [her] hands loose that [she] could go." He also told her not to tell anyone that he raped her, to "just tell them you got robbed," or he would "come back and kill" her.

A.R. testified that she was able to get one of her hands free "just a minute" after the man left. A.R. gathered her cell phone and her cigarettes and "ran to the front door." She found that the front door was locked. A.R. unlocked the front door and went to her neighbor's house "and started banging on [her] door." A.R.'s neighbor, Laura Henson, testified that she awoke on July 25, 2009, to A.R. "banging on [her] bedroom door" around 3:00 a.m. Ms. Henson testified that the victim had "her sleeping clothes on" and an electrical cord "on her arms." Ms. Henson testified that A.R. was "hysterical and upset." According to Ms. Henson, A.R. was crying and asking for her partner. A.R. told Ms. Henson "that her house had been broken into and that she had been raped."

---

[1]It is the policy of this court to refer to victims of rape by their initials.

Ms. Henson testified that she told A.R. "that she needed to call 911." A.R. called 911 from Ms. Henson's house and stayed there until the police arrived. A.R. did not tell the 911 operator that she had been raped, but she testified that she told the first officer to arrive that she "probably needed to go to the emergency room" because she had been raped. Investigator Monty Essary of the Dyersburg Police Department (DPD) testified that when he spoke to A.R. on July 25, 2009, she was "very upset," "[e]mbarrassed," "[a]shamed," and "not comfortable" talking about what had happened, but A.R. did tell him that she had been raped. Inv. Essary and A.R. did "a walk through" of her house before she was taken to the emergency room. A.R. testified that when she walked through the house with Inv. Essary, twenty-three dollars was missing from the living room.

Inv. Essary testified that the back door of the house showed signs of "forced entry." The door frame and door "had cracks and busts in" them. A.R. testified that she and her partner did not use the back door and had locked it and covered it with a black felt sheet. Inv. Essary noted that the felt sheet had been nailed around the top and sides of the door, but that it was torn "away." In the bedroom, Inv. Essary found a wet wash cloth, a vacuum cleaner, and "a black t-shirt with a knot tied in it," which he believed had "been tied around" A.R.'s face. In the dining room, Inv. Essary found a "clock radio . . . with the power cord cut off." Police recovered the electrical cord wrapped around A.R.'s wrists when they arrived at Ms Henson's house, and Inv. Essary noted that A.R. had red marks on her wrists. A used condom and some toilet paper were found in the commode in A.R.'s bathroom. Inv. Essary testified that no blood or usable fingerprints were found in A.R.'s house.

Commander Billy Williams of the DPD testified that he was in charge of the DPD's Criminal Investigation Division and that he was also the Defendant's uncle. Cdr. Williams testified that he interviewed the Defendant about the offenses. Cdr. Williams told the Defendant he was suspected of raping a white woman and told him "where that incident took place." The Defendant did not say anything about having a relationship or consensual sex with A.R. during the interview. The Defendant volunteered to give a DNA sample and said that "he knew he didn't rape anyone." The Defendant told Cdr. Williams that "he was incarcerated" at the time of the offenses, but Cdr. Williams testified that "the investigation revealed that he was not . . . incarcerated when [the] offense[s] occurred."

Cdr. Williams testified that the Defendant's hand was bandaged when he interviewed him some six weeks after the offense. Cdr. Williams further testified that the Defendant had previously told him that a dog had bitten his hand. Subsequent forensic testing by the Tennessee Bureau of Investigation revealed that the Defendant's sperm was on the inside and outside of the condom found in A.R.'s toilet. When confronted with this DNA evidence, the Defendant told Inv. Essary that he wanted "another test run."

The Defendant denied raping A.R. and testified that he was introduced to her by a mutual friend, Larry Phelps, who "stayed two houses down from her." The Defendant claimed that A.R. "wanted to buy some pills" from him. According to the Defendant, over time, he had developed "a physical relationship" with A.R., and they would have "casual sex" "every now and then." The Defendant claimed that he would meet A.R. "[e]ither early in the day or late at night," usually "when she wanted to buy . . . pills from [him]," in order to avoid A.R.'s partner. The Defendant testified that he took A.R. out to lunch one time and "to [his] sister's house when [he] was staying with [his] sister."

The Defendant claimed that on July 25, 2009, A.R. called him wanting him to bring some cigarettes to her house. The Defendant testified that they had consensual sex and that when he finished he put the used condom in a trash can in the bedroom. According to the Defendant, A.R. was pregnant with his child at that time. The Defendant claimed that he was trying to convince A.R. to not have an abortion and that they "ended up getting in a heated conversation" and "got physical." The Defendant testified that he shoved A.R. and that "she stabbed [him] with a knife" on his left hand. The Defendant claimed that he was bleeding from his hand and "ran out of the house." The Defendant theorized that A.R. moved the condom to the toilet and claimed to have been raped because she was afraid her partner would find out about their sexual relationship.

The Defendant testified that he did not call the police when A.R. stabbed him because he "was on house arrest" and was not "supposed to [have] been out." The Defendant also testified that he lied to Cdr. Williams about being bitten by a dog to avoid "getting in trouble because [he] really wasn't supposed to [have] been out on that night." The Defendant further testified that he was afraid his probation would be revoked or that he would get a domestic assault charge. The Defendant testified that he volunteered to give a DNA sample because he had "nothing to hide" and knew that he "didn't rape nobody." The Defendant claimed that he did not tell the police about his relationship with A.R. because it "[n]ever crossed [his] mind" that she might have accused him of rape.

Inv. Essary testified that he was unable to find any evidence that a man named Larry Phelps ever lived "two houses down from" A.R. Inv. Essary further testified that he was unable to find anyone who could confirm that the Defendant and A.R. had a relationship of any kind. A.R. testified that she had never met the Defendant, never bought pills from him, and never had a sexual relationship with him. A.R. denied the Defendant's claims that they had consensual sex on July 25, 2009, that she had a fight with the Defendant and stabbed him, and that she moved the condom from a trash can in the bedroom to the toilet. Ms. Henson testified that she never saw the Defendant with A.R. or at A.R.'s house.

Based upon the foregoing, the jury convicted the Defendant of aggravated burglary, aggravated rape, and the lesser-included offense of theft of property valued at $500 or less. The trial court subsequently held a sentencing hearing at which it was established that the Defendant had prior felony convictions for aggravated assault, aggravated burglary, possession of marijuana with intent to sell, and sale of .5 grams or more of cocaine. The Defendant also had a misdemeanor conviction for attempted escape. The Defendant's first felony conviction occurred when he was sixteen-years-old. The Defendant was on community corrections for his two drug convictions when he committed the offenses in this case.

The trial court determined that the Defendant was a Range II, multiple offender. The trial court then determined that the following enhancement factors applied: (1) the Defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range; (7) the offenses were committed to gratify the Defendant's desire for pleasure or excitement; (8) the Defendant had previously failed to comply with the conditions of a sentence involving release into the community; (11) the offenses involved the threat of death or serious bodily injury, and the Defendant had previously been convicted of a felony that resulted in serious bodily injury; and (13) the Defendant was on community corrections at the time of the offenses. See Tenn. Code Ann. § 40-35-114(1), (7), (8), (11), (13).

The trial court stated that it had reviewed the record and had considered "the general principles of sentencing." The trial court stated that the Defendant had been convicted of "two very serious charges" and that his sentence should reflect the seriousness of the offenses. The trial court found that confinement was necessary to protect society from the Defendant, noting that he had "a long history of criminal conduct all [of his] young life." The trial court stated that confinement was necessary to avoid depreciating the seriousness of the offense. The trial court also noted that measures less restrictive than incarceration had recently and frequently been applied to the Defendant and had "not been successful." The trial court concluded that there was "no potential for rehabilitation" with the Defendant.

The trial court sentenced the Defendant to the maximum of ten years for the aggravated burglary conviction; the maximum of forty years, to be served at one hundred percent, for the aggravated rape conviction; and to eleven months and twenty-nine days for the theft conviction. The trial court ordered that the Defendant's sentences be served concurrently, for an effective sentence of forty years. However, the trial court ordered the Defendant's sentences in this case to be served consecutively to the remainder of his sentence for his prior conviction of sale of .5 grams or more of cocaine.

ANALYSIS

*I. Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to sustain his convictions. The Defendant argues that he "was never found with a weapon or any property of the victim" and that A.R. did not "suffer any injuries consistent with the attack she described." The Defendant further argues that A.R.'s "uncorroborated testimony is the only evidence that the encounter between the parties was not consensual." The State responds that the evidence was sufficient to sustain the Defendant's convictions.

*A. Standard of Review*

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond

a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

## B. Aggravated Burglary

Aggravated burglary is the entry of a habitation "without the effective consent of the property owner" with the intent "to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402, -403. Here, A.R. testified that she did not know the Defendant and was asleep when he entered her home. Inv. Essary testified that the back door of A.R.'s house showed signs of "forced entry" in that there were "cracks and busts in" the door and door frame and the black felt sheet hung over the door was torn "away." Inv. Essary also found a "clock radio . . . with the power cord cut off" in A.R.'s dining room. A.R. testified that she awoke to the Defendant's pointing a gun at her face, that he bound her, and that he demanded money. When the police arrived, A.R. had an electrical cord dangling from her wrist, and there were red marks on her wrists. Accordingly, we conclude that the evidence was sufficient for the jury to conclude that the Defendant entered A.R.'s house without her effective consent and with the intent to commit a felony, theft, or assault.

## C. Aggravated Rape

As relevant here, aggravated rape is defined as the "unlawful sexual penetration of a victim by the defendant . . . accompanied by" the use of force or coercion "to accomplish the act and the defendant is armed with a weapon . . . ." Tenn. Code Ann. § 39-13-502(a)(1). Sexual penetration "means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

A.R. testified that the Defendant, armed with a gun, bound, blindfolded, and attempted to gag her. The Defendant removed her pants and underwear and penetrated her vagina with his penis. When she cried, the Defendant told A.R. to "shut up" and demanded that she "f--k

back." When he finished, the Defendant wiped A.R. with a wet wash cloth and ran the vacuum cleaner in the bedroom. Once freed, A.R. went to Ms. Henson's house with the electrical cord still wrapped around her wrists and red marks on her wrists. Inv. Essary found a vacuum cleaner, a wet wash cloth, and "a black t-shirt with a knot tied in it" in A.R.'s bedroom. A used condom was found in the toilet of A.R.'s bathroom. Subsequent forensic testing revealed the Defendant's semen on the inside and outside of the condom. A.R. denied knowing the Defendant or having any sort of relationship with him.

Essentially, the Defendant's argument is that the jury should have believed his testimony over the "uncorroborated testimony" of A.R. However, determinations regarding the credibility of witnesses are the province of the jury and not this court. Here, the jury chose to accredit A.R.'s testimony over the Defendant's, and we cannot revisit that decision on appeal. Furthermore, "Tennessee courts have long held that both minor and adult victims of forcible or coercive sex offenses, such as simple rape, do not qualify as accomplices and are not subject to any corroboration requirement." State v. Collier, 411 S.W.3d 886, 896 n.8 (Tenn. 2013). Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for aggravated rape.

### D. Theft

Theft occurs when a "person knowingly obtains or exercises control over [another's] property without the owner's effective consent" and "with intent to deprive the owner of [the] property." Tenn. Code Ann. § 39-14-103(a). Here, A.R. testified that the Defendant pointed a gun at her face and demanded money. A.R. told the Defendant that she had twenty-three dollars on the coffee table in her living room. When the Defendant was unable to find the money, he came back to A.R.'s bedroom, and she "had to tell him exactly where it was." A.R. testified that when she came back to her house with Inv. Essary, the twenty-three dollars was gone. As such, we conclude that the evidence was sufficient to sustain the Defendant's conviction for theft of property valued at $500 or less.

### II. Sentencing

The Defendant contends that the trial court erred in sentencing him. The Defendant argues that the trial court failed to make "findings as to why maximum sentences were appropriate." The Defendant also argues that his total effective sentence was excessive. The State responds that the Defendant has not overcome the presumption of reasonableness granted to the trial court's within-range sentencing decisions and has not shown that the trial court abused its discretion.

Appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." State v. Bise, 380 S.W.3d 682, 709 (Tenn. 2012) (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706. If this is true, this court may not disturb the sentence even if a different result were preferred. State v. Carter, 254 S.W.3d 335 (Tenn. 2008). Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Bise, 380 S.W.3d at 706. On appeal, the burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Sentences involving incarceration "should be based on the following considerations":

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. §40-35-103(2). Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. §40-35-103(5).

The Defendant does not allege that the trial court misapplied any of the enhancement factors. Instead, the Defendant alleges that the trial court failed to make "findings as to why maximum sentences were appropriate." However, the recorded belies this assertion. The trial court found that five enhancement factors applied to the Defendant's sentences. The trial court then addressed all of the factors listed in Tennessee Code Annotated section 40-35-

103(2), noting that the Defendant had a long history of criminal conduct, that confinement was necessary to avoid depreciating the seriousness of the offense, and that measures less restrictive than confinement had been frequently and recently applied unsuccessfully to the Defendant. The trial court also stated that it believed the Defendant had "no potential for rehabilitation." Only after reviewing the enhancement factors and the purposes and principles of sentencing did the trial court impose the maximum sentence for each conviction. As such, we conclude that this issue is devoid of merit.

With regard to whether the Defendant's effective forty-year sentence was excessive in light of the offenses he committed, we note that the Defendant broke into A.R.'s home at night while she was alone and asleep. He pointed a gun in her face, bound her, blindfolded her, and attempted to gag her. He then demanded money and, after taking what little money she had, raped her. The Defendant became incensed when A.R. began to cry and refused to "f--k back." After raping her, the Defendant attempted to conceal his crime by wiping A.R. with a wet wash cloth, running the vacuum cleaner, and throwing the used condom in the toilet. The Defendant then told A.R. that if she told anyone he had raped her he would come back and kill her and left her on the bed, still bound and blindfolded. As such, the Defendant's argument that his effective forty-year sentence is excessive and disproportional to the offenses he committed holds no weight in this court. Accordingly, we affirm the sentencing decision of the trial court.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE